Case No. 15-5199, U.S. Assoc. of Reptile Keepers Inc. et al. v. Sally Jewell, the Honorable, and her official capacity as the Secretary of the Interior et al. Appellant Humane Society of the United States et al. Ms. Polachek for the Appellants, Mr. Frohla for the Appley U.S. Assoc. of Reptile Keepers. Good morning. May it please the Court, Emily Polachek on behalf of the Federal Appellants. With me at Council's table is Russ Houston with the Department of the Interior Office of the Solicitor. I'd like to reserve three minutes for rebuttal. To prevent giant constrictors from devastating our native ecosystems beyond the point of recoverability, as the Burmese python has done in the Everglades, the Fish and Wildlife Service listed eight species of constrictor snakes as injurious under the Lacey Act and prohibited their import and all interstate transportation. In enjoining this 2015 rule, the District Court made three critical errors. First, the Court overlooked the Lacey Act's early legislative history. Second, the Court misunderstood the requirements for implied congressional ratification. Third, the Court failed to utilize Chevron's two-step framework. We usually start, before we do any of those, with the language of the statute, right? Correct. Okay, why don't you start there. Okay. Start with the language of the shipment clause and tell us how that possibly supports what the Secretary did here. Particularly telling in the plain language is the separate mention of the District of Columbia. There's no reason to believe that transportation from D.C. to Maryland deserves any more protection than transportation between Delaware and Maryland, for example. Under the services theory of the Lacey Act's injurious wildlife provision, the District is listed separately because it is not a state, and Hawaii is listed separately because it is not on the North American continent. That's the only reading that avoids superfluous words or phrases specifically of those two locations. Can I ask you about that? The importation clause also singles out the District. Correct. So it's a little bit odd because I take your point that if the continental United States already includes the District, why list the District? Now, I think we can, you know, the other side points out that may be grounded in the Home Rule Act not having come into being yet, which we can talk about that. But one predicate point seems to be that you could make the same argument about the importation clause, right? Isn't the District of Columbia superfluous as to that, too? Well, the importation clause says into the United States, comma, the District of Columbia. So, again, because the District is not a state, it does have significance from the United States. But isn't it in the United States? It is in the United States, but to the extent that the United States there is also a collective noun in the same way that the continental United States is used as a collective noun, the United States could be read to include only the states. So you think when it says no importation into the United States, it could be read to say, but you can have importation into the District of Columbia? It could be read that way. And if you look actually back at some of the earlier iterations of the Lacey Act, there has been some back and forth where it's at some points. Originally, it simply said importation into the United States. Then in 1909, it said importation into the United States, comma, or any territory or district thereof. So it's gone back and forth to some extent in the past. And so the fact that it's included in there isn't necessarily, it doesn't render the district superfluous in that instance. And the surfaces reading of the injurious wildlife provision would also, it gives the districts independent significance. And then the other important. What about the home rule? Can you talk about the home rule? The home rule, it was in effect at the time of the 1960 amendments. My understanding is that it was enacted in 1959 after Alaska became a state. But the problem with the home rule is that it defines the continental United States to include the 49 states on the North American continent and the District of Columbia. On what does it provide? You're talking about the Dictionary Act now, not the home rule. Oh, yes. I apologize. I think that Judge Shreve also asked you about the home rule. Yeah, I thought the possible explanation is that Congress thought that other states could protect themselves. But then with respect to the District of Columbia, Congress is the body, because at that point we didn't have the local D.C. legislative authority. Congress had to do it. That would call into question why Hawaii is listed separately if the states can protect themselves. But Hawaii is listed separately because it's not part of the continental United States. So we're only talking about the states within the continental United States can protect themselves, but the district can't unless Congress does something. Isn't that the—I thought that's the argument that's being made by the other side. Yes, but, I mean, again, Hawaii could protect itself by, for example, Hawaii prohibits any states from being imported into or possessed in Hawaii. So it calls into question why, if Hawaii has its own ban, why does Hawaii need to be included then separately from the United States? I'm going to ask the other side this question, and I'll put it to you. Does the act prohibit transportation or shipment between two possessions, so between Guam and American Samoa? Yes, and this is another aspect where the services reading is important here because the or in that list is very telling. It means that each of the entities listed have independent significance. They can be used in the alternative. And the fact that between is used, between doesn't—it no longer has to be used only between two things. It can also be used to indicate multiple one-on-one relationships. So, for example, you could say that shipment is prohibited between the continental United States, which would be between any two states in the continental United States, or it could be between any possession of the United States. But you see, the language is different because the possession clause says any, whereas the continental United States doesn't. Well, I mean, to the extent that there's a difference, I mean, we know which states are on the continental United States. It's sort of self-evident, whereas any possession is, you know, a more fluid topic. But I think that an important thing to realize here is that this language is at the very least ambiguous, and that's evident from the fact that even U.S. ARC's former president, Andrew Wyatt, in testifying on H.R. 511, which was a bill that would have listed these snakes as injuries by Congress, even he stated that he understood Section 42 to prohibit interstate transportation of the snakes. So, I mean, it's clearly ambiguous language. And in that sense, then we need to look at other indicia of congressional intent. And I think that there we should start at the early history of the Lacey Act. And the DISH report, it said that prior to the 1960 amendments, the Lacey Act did not address the domestic transportation of listed species. And that's simply not true. If we go back to the original enactment of the Lacey Act in 1900, Section 2 of the Lacey Act, which is the injurious wildlife provision, prohibited the importation of foreign and injurious wildlife. Section 3, then, the trade provision, it prohibited transportation from one state or territory to another state or territory of any foreign animals or birds, the importation of which is prohibited. Since injurious species could not be imported, they also could not be transported in interstate commerce. So this is something that has existed since the very beginning of the Lacey Act, and it's consistent with the Lacey Act's purpose of trying to prevent unwise introduction of injurious species. But the language of the 1960 amendment is very different. The language of the 1960 amendment is somewhat different, but it's explained that the amendments were meant to be technical in nature, and they were meant to clarify the stated purpose of the 1960 amendments was to reduce more effectively the hazards arising from the importation of injurious wild animals and to curtail traffic in such species. So curtailing traffic was listed separately from importing. And looking at the way that the language has changed over the years, what happened in 1960 was that the trade provision, which had previously discussed foreign species and importation, removed all references to importation. And instead, this new language was added into the injurious wildlife provision. So it's reasonable to assume that Congress was not changing the meaning, the overall intent of regulating injurious species in interstate transportation. Well, didn't the 1936 amendment make this much more like... Yeah, in 1930... It switched it to... It changed importation, which is prohibited. That was in the old act, to animals imported from any foreign country, which suggests that the ban applies only to the animal that's imported, not animals that are already here. That's correct. But that's exactly AHRQ's position. Well, no. I mean, AHRQ would also say, AHRQ says that, I mean, that language would mean that if something were imported from another country illegally, it also could then not be moved between the states. So, for example, if it came into a port in California, it couldn't be sent to a retailer in Texas. And U.S. AHRQ does not believe that that's what the statute said. But more importantly, if we look at the 1960 amendment, it does say that the language has been broadened a bit. And so the fact that the Lacey Act originally in the 1900, the 1909 amendment, it did prohibit the interstate transportation of all injurious species, both those that were imported and those already here, and that we're continuing that in 1960 by broadening the language to back what it had been previously. So even under AHRQ's interpretation and under the district court's interpretation, the 1960 amendment did do something because it dealt with traffic between Hawaii and the contiguous states. Right, and that's important to keep in mind, that at the time that the 1960 amendment happened, one of the biggest concerns was about the mongoose, which was really running amok in Hawaii. So there was specific concern about the mongoose coming over from Hawaii. And that might explain another reason why Hawaii is listed separately, to be sure that it had some protection. But that seems like an argument against you, because that's what the shipment clause accomplished, was to make sure that the mongoose, and to the extent there's other species like that, indigenous to Hawaii, that there's not traffic between Hawaii and the contiguous 48 states. Well, again, even under the previous language, had something been imported into Hawaii and then sent stateside, that would have been illegal as well, if it had been imported into Hawaii. So, I mean, the language has been brought in. I mean, perhaps that's the reason, but it also is reasonable to assume. I mean, they clearly were trying to do that with respect to the mongoose, even I think the government acknowledges that, right? Right, and so I think the issue with the district court's interpretation here is that he... So Congress must have assumed, in other words, because what you just said about what the pre-existing state of the law was before 1960 would have equally applied to the mongoose. But clearly the separation of Hawaii in 1960 was at least in part intended to deal with what was perceived to be a problem with respect to the possibility that mongooses might come from Hawaii. Right, including mongooses that were already present in the... Exactly, yeah. Yes. But the district court, in discussing this, he talked about how the 1960 amendments didn't change very much, but then he didn't consider what the language had been prior to that, and I think that that's a real problem here. But additionally, I think that something that the court absolutely must consider is the recent legislative history, because over the last quarter century, Congress has been explicitly clear. Before you get to that, I mean, what do we make of the purpose of the act as expressed in the original Lacey Act in 1900? It says the object and purpose of this act is, and I'm going to skip some language, also to regulate the introduction of American or foreign birds or animals in localities where they have not heretofore existed. Isn't it significant that Congress said that they wanted to regulate the introduction of American birds or animals? It's American or foreign. And the injurious species, they don't necessarily need to be non-native species. We also, I mean, that's not a requirement for an injurious listing. I mean, I understand, but does that actually support the government's argument that Congress was concerned about things moving from one part of America to another part of America? Yes, yes, absolutely. Yes, and the use of the word locality is also important. It's not talking about continents or any sort of large land mass. I mean, throughout the U.S. Code, locality is meant to usually refer to smaller geographic instances that are smaller than the state. So, I mean, Congress's real concern here was both about the introduction and the spread and establishment of injurious species, and that's been continued through this recent congressional history where, in 1990, Congress listed the zebra mussel as an injurious species with the express purpose of prohibiting the interstate transportation of zebra mussels. This happened again in 1991, which was a year after the service listed the brown tree snake. Congress also listed the brown tree snake. And then in 2010, we have just a plethora of congressional history talking about the need to regulate the spread of Asian carp. This argument, I take it you agree, only gets you somewhere if the statute's ambiguous, right? Well, the ratification. If the statute's clear. If the plain language is clear, then that would be the end. But as long as we agree that the plain language is ambiguous, we turn to legislative history. Sure, of course. And included in the legislative history analysis is ratification, which this court said in Public Citizen v. HHS. So ratification should be considered at the same time that any other legislative history, including the 1960 amendments, is considered. Let me ask you a question about the impact of the district court's decision. The amicus says that if the district court's decision stands, it will affect all listed species. And I notice the government's brief doesn't say that. So what are the exact implications of sustaining a district court here? This really only applies to animals that were already in the United States prior to listed, right? No. I mean, the issue before the court is the scope of Section 42. And if the district court's understanding of Section 42 is upheld, then the scope of that prohibition is thrown into question. Yeah, but will it affect, as amicus says, all listed species? It certainly could. How? Well, because if the language of Section 42 does not allow the service to prohibit interstate transportation of injurious species, then any of those listed injurious species, which there are about 400 different species that have been listed between Congress and the service, it's unclear whether the service can prohibit their interstate transportation. And this is a really big problem with Asian carp, where we are certainly ‑‑ I got the issue about carp, but doesn't ‑‑ if the agency can ban the importation of an animal that's not yet here, you don't really care about the interstate transportation issue, right? Because you can just keep it out of the country. Theoretically, but it's difficult to tell. For example, Hawaii, they don't allow any snakes in Hawaii, and yet they've had 213 confirmed sightings of snakes, including one of a reticulated python. So, I mean, we would certainly hope that an importation ban would be enough, but should an animal somehow make it into the states, it's important that we be able to prohibit its interstate transportation. Okay. Anything else? Nothing? Okay, thank you. Good morning. Good morning, and may it please the Court. The district court focused correctly on the 1960 Lacey Act amendments and the 1960 Act's legislative history. It focused correctly on the fact that this is a criminal statute, 18 U.S.C. 42A1, and it focused correctly on the fact that this case is about domestic species, species born and bred here, or species imported before the effective date of an invasive species listing. We do agree with the government that the relevant question isn't just about zebra mussels or bighead carp. It could be those today. It could be golden retriever puppies tomorrow if the service were to list them as invasive. But that's just the issue. That's just the issue. Because what we're saying is that had Congress, let's go back to 2010, highly partisan environment after the election, what happens? A series of bills come up in the Senate. I'd rather not talk about 2010. I'd rather talk about the language in the statute. Okay. All right. Plain language in the statute. If we were to adopt your reasoning, does the statute prohibit shipment of an injurious species from Guam to American Samoa? Yes, because of the word antipossession. What's important there is that in the structure of the 1960 Act, you see the continental United States versus antipossession. And that was set up deliberately because the any was supposed to connote more than just one possession. It could be two different possessions. And that's actually the same way that for 116 years in the Lacey Act, whenever Congress wanted to specify interstate commerce, it either used those exact words or it used to or from, any to another, or any other to another. It used those kinds of words. This is the only time in 116 years that they've used the continental United States, and that's because every element is singular. Does it prohibit shipment between Hawaii and Puerto Rico? Yes. Why? It doesn't say, I mean, those are separated by commas. They're not separated by and? The way the statute is set up is between A, B, or C. The most logical way to, I'm just going to take it out of the words and put it in ABC. Between A, B, or C, the most logical meaning of that is between A and B, A and C, A and B, or A and C, or B and C. Except that we know with D, it's within D because of the word any. I guess you're saying that's because of the word any. I'm sorry? With D, which is, I'm just hypothesizing, is possession. It bans transfer between constituent parts of D. There could be D prime and D double prime because these are singular entities that are being talked about here because any possession, the way it's presented is in the singular. It's not presented in the plural. The continental United States is singular. Yes, that's exactly what I'm saying. So why then doesn't it ban shipment between states within the continental United States? Because the continental United States is singular and the word any is used for possession. What does continental United States mean? Continental United States means the 49 states that are on North America. Does it include the District of Columbia? It does under 1 U.S.A. 1 unless it doesn't. And here it's separated out for reasons that I think the court has explained before. One is because it's always been set up that way, and second is because of the home rule issues. I think the district court used the word baffling with respect to the inclusion. So that means that it would be illegal to transport a snake from Maryland to the district but not from Maryland to Virginia, right? That's what it means. What sense does that make? Why would Congress have done that? Congress would have done that for the reasons that Judge Srinivasan said. That Congress was exercising home rule authority. Is there anything in the legislative history that suggests that? No. Yeah. But it's been that way. It's been divided out since 1900. It's always been done that way. And one of the principal focuses... Then why aren't you taking... Excuse me. Maybe I... Just correct me if I'm wrong. I thought your position was the same as the district court's, that the statute is... The language is ambiguous, but if you look at the legislative history and the evolution of this, it becomes clear. Correct? Why aren't you arguing that the plain language is clear? Because if you're right about the district, that Congress was exercising its plenary authority, then why aren't you just flat out arguing, look, this statute is clear. It says what it says. Why do you need legislative history? Because the government's been contesting what the statute... I'm asking you about your position. No, that's... Am I right that in your brief, you concede that the district court is correct, that this statute is ambiguous, and that we therefore have to look to legislative history, right? Is that your position? We've explained in our briefs why we believe that the District of Columbia's exclusion is... Maybe this is just a D.C. Circuit-type question, but it affects how we think about the case. If the language is clear, that's end of the matter, right? If you're right about the District of Columbia... Actually, under Chevron step one, we get recourse to the legislative history as well. That's a good argument that Chevron doesn't even apply to this case, right? Yes, a very good argument. All right, so let's not talk about Chevron. Okay. The question is, I want to know from you how you think this court should look at this case, and that is, are you arguing to us today that the district, the, quote, baffling presence of the district can be explained by Congress exercising its plenary authority over the district, and therefore this statute is clear, end of the matter, it doesn't ban interstate transportation of listed species, or are you saying, as the district court did, that yes, the presence of the District of Columbia in this thing makes it ambiguous, and therefore, like the district court, we have to look at the legislative history in order to resolve the case? Which is it? I think I'm going to give you a lawyer's response to a court of appeals question, which is, in our view, it means both. We believe, and have always believed, that it's clear on its face. The district court didn't. The district court's ruling is under review, and we believe the district court, in terms of the legislative history, it is indeed baffling. If there's no Chevron difference here, we're de novo, right? Yes. Okay. So your legislative history is an even if argument? Even if, exactly. And it is crystal clear. But your first position is we don't have to get to any of that. Fair point. I take it that if the statute said between any of the continental United States, if it used any with respect to the continental United States, as it does with respect to possessions, then you would say that the statute is clearly the other direction? Exactly, because that's exactly how, for 116 years, the Lacey Act has dealt with interstate commerce. In fact, in Section 43, that is how it dealt with it. So, yes, that's absolutely correct. So you agree that Congress's purpose in 1960 was to strengthen the act, right? Yes, it was to strengthen the act for a very specific reason. So how did it do that? How did it do that? Under your theory. Under our theory, Section 42, that section dealt with imports, and only imports, importation of these injurious species being prohibited. Wait, but I thought it dealt with transfers from Hawaii to the contiguous United States. But before 1960, it dealt with imports. Yeah, but in 1960. I'm sorry? But in 1960. In 1960. I thought Judge Tatum's question was what was done in 1960. I was just sort of stepping back from the following sequence. In 1960, what occurred was, in addition to the import ban, that import ban was expanded incrementally to deal with a situation like the mongoose in Hawaii, Puerto Rico, and the Virgin Islands. So it was expanded just enough to treat traffic from the insular possessions like an import, which sort of makes sense in its own way. You come and you have water, except for the district, and even I guess that's landlocked, not landlocked. You're dealing with essentially bringing an invasive species to the mainland. So if someone imports an animal on the list, what part of the statute bans the interstate transfer of that animal? At this point, in 1960, it was Section 43. Now it's in 16 U.S.C. I think it's 33. Is that Section 43? It's in 16 United States Code. It's in what? It's now moved into the civil provisions. I think it's 3372. But it's not a crime anymore. It's a civil violation. There actually is, in that statute, in the penalties provisions, there is sort of a knowing and willful escalator. So then, once again, in what respect was the statute strengthened? Tell me again. In 1960? The only way that interstate transport of an invasive species is banned under that civil section that we're talking about now is if it's being transported in violation of federal law. It's here in violation of federal law. It's an illegal species, the same way that, going back to 1900, a deer killed out of season is. Can I just ask you, if I'm not the person who imported the animal on the list, if I'm someone else, is there something in any of these statutes, in 42 or 43, that prohibits the interest for me for transferring that animal between states? That makes it criminal? Species imported in violation of federal law are treated essentially like contraband. But if they're domestics, they're not. If they're what? If they're domestic species, they're treated differently. But species imported in violation of the Lacey Act are treated essentially like contraband, so yes. Those can't be redistributed in interstate commerce? That's correct. Wait, so if a reticulated python makes its way in against the importation ban, makes its way into the United States, and then reproduces a bunch of other reticulated pythons, which apparently they can do prodigiously, and then those offspring are transferred, does the importation and shipment and then trade ban affect the offspring? Yes. It does? It does. How do we know that? I believe the word offspring is used in the statute. I thought your position was that the statute didn't prohibit the interstate transportation of these animals. Of animals that are legally here. This isn't quite like citizenship. It's not quite like if the snake's born here, it becomes a citizen. Even before they were put on the list. I'm sorry? Before they were put on the list. Before they were put on the list. Animals that were here before they were put on the list. Yes, Your Honor, I apologize. Before they were put on the list, correct. I'd like to turn, if I... Well, that's clear. I guess at some point, I have about two minutes left. I think I'll spend one minute on the congressional doctrines back where I started when Judge Wilkins wanted to talk about the plain language. And the district court was right when he explained that it's one thing for Congress to think that, you know, basically assume that the law, 42 U.S.C., applied to interstate transportation and simply incrementally include the Asian carp, which no one really likes for good reason, versus the broader question that's presented is, has the administration come to Congress and explained to Congress that what it really wants to do is expand the criminal law so the Fish and Wildlife Service can gain a whole new set, a whole new range of criminal authority over interstate commerce and supplant the state's police powers. That's a bigger issue. You mean retain the authority it's claimed, right? Because it's... Retain the authority, but it hasn't... But isn't that right? It has banned the interstate shipment of the big head carp, and Congress amended the law thinking that's what it was doing, right? But it extended its authority by regulation. It didn't extend its authority by law. But what did Congress do when it amended the Lacey Act to include the big head carp? I think the district court had it right on page 34. What it did was it thought it was addressing transport of big head carp. It was just wrong. It didn't have the authority to do that. It didn't. Going back to the 1990, when the assistant secretary of the Interior came into Congress, the assistant, who's at least now is above the director of the Fish and Wildlife Service in the yellow book, came into Congress and said in connection with the zebra mussel, if you want to know how to deal with zebra mussels, here's how you deal with it. And her last point, and she presented this to both houses, and you better believe that if the assistant secretary is in there giving testimony to Congress, some solicitor at Interior looked at it. She said it's not going to be enough. You're going to need to say something else if you want to deal with zebra mussels in interstate commerce. And that's the last word. That's the last word that the Interior Department in this record has provided to Congress. Okay. Anything else? No. No. Okay. Thank you. Did counsel have any time left? Would you like two minutes? Okay. You've got it. Thank you, Your Honor. First of all, responding to that last point, the last word is not what the agency said. The last word is what Congress intended. And here Congress has made its intention with respect to this statute very clear, and it's not limited to any species. Congress said that Section 42 prohibits the interstate transportation of species. And that's clear from the fact that both in 2002 and in 2009, Congress specifically wrote to the service and asked them affirmatively to list Asian carp because Congress understood that Section 42 would ban the interstate transportation of Asian carp. So they understood already that that's what the section did for any species that was listed. It wasn't specific to any species the way that the district court has said. Of course, that wasn't the 1960 Congress expressing that view. No, but again, with the doctrine of implied congressional ratification, if Congress has amended the act, the provision at issue, if it's clear from the court or if there's evidence that Congress did or should have known about the agency's meaning, and if the agency's meaning has been long held, then Congress can ratify that understanding. And that's what's happened here in both the 1990 listing of zebra mussels, 91 with brown tree snakes, 2010 with Asian carp, and then very importantly in 2012 and 2014 with Lake Texoma with zebra mussels. Congress actually went out of its way to enact a statute that would allow for transfer of water from Oklahoma to Texas specifically because and only because it was understood that the Lacey Act would otherwise prohibit those transfers. All right. Did you have a second point you wanted to make? I would just, again, that this comes back to congressional intent, and Congress has acted deliberately here and said that it needs to prohibit the interstate transportation of injurious species not only because of the issues with these snakes but for other injurious species as well. So the district court needs to be reversed. Thank you. The case is submitted.
judges: Tatel, Srinivasan, Wilkins